The Honorable, the judges of the United States Court of Appeals for the 8th Circuit. Hear ye, hear ye, hear ye. The United States Court of Appeals for the 8th Circuit is now in session. All persons having business before this Honorable Court may now draw near and they will be heard. God save the United States and this Honorable Court. We have one case for hearing this afternoon, a special setting that we've made to accommodate the parties and counsel. And Mr. Chang, if you're prepared, please proceed. Good afternoon, Your Honors, and may it please the Court. Americans don't lose their First Amendment rights just because they work for the government. It's undisputed that Mr. Melton was fired because of his pro-life Facebook post. It's also undisputed that the Facebook post did not cause any disruption to the fire department. Mr. Melton should prevail for two reasons. First, the defendants failed to put forth sufficient evidence of disruption to trigger Pickering balancing. And even if we get to the balancing, all the factors weigh in favor of Mr. Melton. Second, Mayor Williams conceded the existence of an unwritten policy that gives him the unbridled discretion to decide who to fire. This court should reverse. Counsel, I want to ask you about the unbridled discretion claim. Is it does it apply in these circumstances? And I'll tell you why. Every case I found applies in a different circumstance. Not one where it's an after the fact, but a prior restraint where somebody has unbridled discretion about what speech to allow. Why should we extend it here? So it applies. Your Honor, the base. The simplest answer I can give you is that the city has this policy and it applied to my client and fired him. And the best case support I can give you for that, Your Honor, is the Cochran versus city of Atlanta case. There, the district court also looked at a policy that gave the city an unbridled discretion and assessed whether or not the firing of the fire chief in that case ran afoul of the First Amendment. I see that. But was that a prior restraint or was that an after the fact like this case here? So it wasn't after the fact case like ours as well. So in our view, the fact that the prior restraint operates exposed doesn't really matter. We think that the maintenance of the existence of the policy, which gives the city the unbridled discretion. We think that's the problem. Problematic part of why isn't this? Why isn't this just I mean, here's the problem I'm having. There may be a district court case or whatever, even a circuit court case. But my problem with it is it mirrors a retaliation claim. Retaliation is for an after the fact action. And so it just feels it feels like we're just having two bites the same apple here by doing an unbridled. It makes sense in the prior restraint where where you're having your speech limited before you ever get there. So there's no retaliation. I'm not so sure it makes so much sense here. Sure. I mean, so I think I think I mean, respectfully, we think that applies here. But even if you disagree, I mean, my client is also asking for reinstatement as one of one of one of the relief. So going forward, this court can still enjoy the defendants from enforcing this policy against my clients. So we think that this claim is presented the right way. And I think that's a nice pivot to the main claim that my client has, which is Pickering claim. And because there was no actual disruption to the fire department, defendants here have to rely entirely on the reasonableness of the mayor's prediction of disruption. Mr. Chang, to that to that point, don't the cases say that disruption can be potential disruption as well as actual disruption? It has to do with the potential for it and the likelihood of it as opposed to actual disruption within the department, as well as issues that may arise outside the department, where, as in this case, you have the facts related to public expressions of citizenry about their concerns about having someone with these views or someone who who's been who's in the appellant's position coming to their house. Certainly, so we don't disagree that potential for disruption can be a factor in the government's favor. However, that is so we still have to assess the reasonableness of that prediction. And what the cases teach is that the prediction still has to be reasonable in the light of the record evidence that defendants have put forth. This court does not give a rubber stamp approval to whatever interest that the government asserts, like it is a rational basis test. Rather, this court requires specific evidence that supports the prediction of disruption. So so it's important to divide the evidence that's available. Your honor, your honor mentioned certain calls that came in after Mr. Melton was fired. In our view, what's really relevant in assessing the reasonableness of the mayor's decision at the firing is the information that he had at the time that he made a decision. And the outset, I'll note that the evidentiary burden on the defendants here is greater because Mr. Melton engaged in the speech about a public concern. Abortion is one of the greatest political issues of our day and also one of the most profound moral issues. So, Mr. Melton, Mr. Chang, before you go further, you raised a good point about the timing of potential disruption. How can we find in the record? Is there in the record something that shows the timing of the various statements surrounding the the posting? Is there something that that lays out when the connection or call or interaction between Mr. Mr. Melton and the former colleague and then also the timing of the public's calls, the timing of the media inquiries when those came in in relation to the meeting in suspension. Sure, we know that the call with Mr. Dale, a former firefighter, came the day before the meeting that you talked about. Other than that, I mean, the timeline is vague and we think that's the government's failure because ultimately the government has the burden to put forth specific evidence to articulate why their prediction is reasonable. We do know that there the mayor mentioned 20 or 25 citizens who called. Again, the timing is vague, but we do know that the timing was a two week period following the suspension meeting. So best reading of that is it happened after the firing in response to the one sided news coverage that aired that my client was not able to tell his side of the story at the time. And of course, when the one sided news story like that gets gets aired, this is not an unreasonable response that a group of citizens might have. But so so for those reasons, just to add to that, is there is there a possibility that there would be something that would be an obvious disruption? So I'm just going to give an example. Suppose a police officer went on TV and said, I'm going to shoot everybody that I stopped in a traffic stop. And and and, you know, that's speech. Right. And so then then would the mayor be OK going in and saying, well, you know what, we don't do things like that here. This is going to cause a disruption. It's bringing disrepute upon the police, the police force. I'm going to fire you. Maybe we don't have that here, but I just wonder if there's some cases that are so obvious that you don't even need evidence of disruption. I mean, I don't think that's right. You're on there. Even speech like that technically has to go through the three three steps for Pickering analysis that this court analyzes. And the example that you gave might not even pass through the first step, which asks whether a speech concerned a matter of public concern. And of course, like a speech like that, obviously, you know, I mean, we think I mean, the reasonableness of the prediction of disruption is so obvious there that a police officer given his duty to take care of the citizens is saying something so contrary to his duty and his job. We think that's a completely different case. Like you noted, in our case, the district court agreed with us that this was a pro-life post. And what preceded was minor occurrences of misunderstanding about the post. And we know that the mayor now is now pivoting to the to the information that the mayor had at the time of the firing. We know that the mayor said that some citizens sent the post to him. But that statement by itself is not sufficient to support a reasonable the reasonableness of the prediction of the harm. And the reason is that we don't know who those citizens are. We don't know where they're from. We don't know what they said. We don't even know whether they complained. Counsel, what about the reasonableness of the mayor's perception of the post, which seemed to be. He viewed it as potentially inflammatory and at best ambiguous. Sure. So this court does not defer to the government employers interpretation of the post. And this what this court does is it looks at the content form and the context of the speech to decide for itself what what the speech meant. And if you look at the post, you know, again, the district court agreed with us that this was a pro-life post. There are several features, including the biblical cord, as well as the resemblance to the black and white silhouette that you see in a sonogram. And also the intent of the speaker matters, as this court said in Bresnahan. And we have a deposition testimony from Mr. Melton saying you highlighted the aspects of it that that certainly favor your side. But a noose in a womb is not something that one would normally anticipate, nor would you anticipate a phrase that at the time had a very powerful meaning. I can't breathe. It it while it could apply to maybe a struggling pre-born, it very clearly had at least a resemblance to words being used in in connection with a very high profile incident. Sure, of course, your honor. So we think it's completely within the bounds of permissible advocacy to use a slogan that's that's popular at the time. And this picture, of course, depicts accurately what millions of pro-life Americans view abortion to be, which is the death penalty for the baby in the womb. So this is within the main line of pro-life advocacy. And so so using also the slogans, we cited another example where the pro-life groups used the black pre-born lives matter kind of going after the BLM slogan that was popularized at the time. So I think this is within the nature of speech that you try to persuade your fellow citizens by using what could speak to them. Mr. Chang, you're within your rebuttal time. You can continue with your principal argument, if you like, or you can reserve it. It's your choice. I appreciate that, your honor. I just have a few points to hit on before I sit down. I'll make it quick. So we so critical to the assessing the reasonableness of the prediction also is the fact that Mr. Melton's post was up for about two weeks before Mr. Dale called or Mr. Melton was called into a meeting with the mayor and the fire department operated without any disruption. No issue. No firefighters complained. That's very significant because at the end of the day, Pickering is a doctrine that's bottomed on the on the special concern for government efficiency. So if you had two week periods where the fire department was able to operate without any issue, that cuts against the prediction that the speech was going to disrupt the fire department's operations. But does it does it matter that the nature of fire operations is sensitive in and of itself? And then how the public relax to basically those protective services, whether it's police or fire department, can be different. Right. And that there is a greater risk of harm with those emergency responders, first responders. Sure. Certainly, this court does give some deference when it comes to the police and the fire forces. But at the same time, this court still requires specific evidence to support the prediction. And the best case I can give you for that is the Washington case. The Washington, Washington case also involved a firefighter. So there, even though the government relied on the deference that you just talked about, this court still said that the evidence was insufficient to afford qualified immunity. And one more point to that, Judge Erickson. I think it's also significant that during the deposition that Mayor Williams said that he's open to having Mr. Melton come back as a firefighter. We think that cuts against his prediction that Mr. Melton was unfit to be a firefighter. And one more point to that is Mr. Melton currently works as a sheriff's deputy. So, you know, he has had no issue working as a patrolman, interacting with the citizens. So that cuts against the government's prediction of harm and unfitness of Mr. Melton as a firefighter as well. And briefly, just very briefly. I'll just talk about the qualified immunity just very briefly. So the law was clearly established when Mr. Melton was fired. In Belk, this court said that as early as 1985, the government may not fire an employee in a way that infringes the employee's First Amendment rights. And in Sexton, this court also said that the imprecision of the Pickering balancing itself is not a barrier to defeating qualified immunity. And factually, the best case I can give you is the Washington case. Again, they're the firefighter engaged in political speech outside of work. And the government there did not provide sufficient evidence, even even evidence supporting the prediction of the harm. And this court denied qualified immunity. And again, briefly, municipal liability. The mayor acted as a final decision maker. So even if you disagree with me on qualified immunity, the mayor is still liable in his official capacity and so is the city. And I'll come back in rebuttal. Thank you, Your Honors. Thank you, Mr. Chang. Ms. Monaghan. Good afternoon. May it please the court. I'm Sarah Monaghan on behalf of the, I believe in this case, the city of Forest City and its former mayor, Cedric Williams, here today asking this court to affirm the district court's denial of the appellant's motion for summary judgment and to affirm the grant of summary judgment for the city and Cedric Williams. The court should affirm the district court's denial of summary judgment to Mr. Milton. First of all, because Mr. Milton's speech was not protected speech under the First Amendment, because the image that he posted on Facebook was not speech on a matter of public concern. Really? Abortion is not a matter of public concern. Are we isn't there an entire presidential election where one of the sides is talking? Both sides are talking about abortion. I would think that's not an argument you would be making. It's not clear what Mr. Milton was communicating with the image that he posted. If you look at the content form and context of that image at the time it was posted, it is not a picture of a sonogram, as Mr. Chang suggests. The only clear images in the image is the image of a noose and the image of the words I can't breathe with a baby. Right. With an infant. And but, you know, definitely not clearly communicating that there's a womb in the image. Certainly not a sonogram, as Mr. Chang suggests. I guess my point is, is somebody in the pro-life community, the reasonable observer, could look at that and say, I know exactly what that is and maybe it's not apparent to everybody, but I would still think that something like that, as controversial as it may be, is still entitled to free speech protection. What am I missing? Well, it's the city's position that it would not be clear what Mr. Milton was communicating based on what's contained in the image. It's not clear. Wait a minute. I hate to go outside the record. But you know, that particular image in reverse color with a white baby with a black background is frequently been used by pro-life organizations. Right. I mean, and it's it's repeatedly published. You can go online and do an image search. You're going to find that it's for sale. You're going to find that it's been used by state right to life organizations. That's just that that image would, you know, without the I can't breathe and reverse is entire. It's like all over the place. And for you to say that it would be cognizable to a person who's pro-life. I find that I find that somewhat disingenuous. Well, I'm not saying that it wouldn't be cognizable to a person who is pro-life. What I'm saying is the city, the mayor didn't recognize it as an image that was pro-life. And he wasn't the only one in the city that didn't recognize it as a pro-life image. What the mayor, the citizens recognized it as was a racist image. And I think that may very well be true, given the presence of the news and the statement. Right. It becomes it becomes a very different message. But the picture itself, I just don't I don't think that that that's accurate. OK, well, there was the mayor did testify that that was not a pro-life image that he saw in the image. He did not recognize it as an image of a womb. He recognized the image of a baby and a noose and the words that said, I can't breathe. And so what the pro-life community recognizes, I can't speak to. I can speak to what my client recognized it as and what other citizens in this community. Let's suppose let's suppose it is racist, racist speech, as the United States Supreme Court has said, and places like Virginia versus black, you know, the cross burning case, racist speech is still protected. Now, you may be may have a good argument. You know, I haven't heard it yet, but you may have a good argument that about what the mayor thought may help you on another prong of the Pickering analysis. But I just think this protected speech argument is a complete loser. I mean, maybe you can convince me otherwise, but I don't see how you get out of the questions that Judge Erickson I've been asking. Well, even if the court does determine that the posting of that image was. Communicating speech on a matter of public concern. The city and the mayor have produced evidence showing that this Facebook post did create actual disruption in the workplace. And the district court did properly determine that the city's interest in promoting the efficiency of the public services that it performs through Mr. Milton outweighed Mr. Milton's interest in commenting on matters of public interest. Did the district court make a finding of actual disruption? Wasn't it a finding of potential disruption as opposed to actual? Well, the district court's finding was of actual disruption based on what the district court noted as the phone calls received from citizens requesting that Mr. Milton not be sent to their home in case of an emergency, which is obviously an actual disruption. The fact that the fire chief's phone was blowing up, as the mayor put it over this Facebook post. The mayor was spending time taking complaints about the post and responding to media inquiries. And the fact that there were many hateful comments posted on the city's Facebook page. I'll ask you what I asked the other side. Where do we find in the record and how can we find in the record a timeline of the communications from the public specifically to the mayor? It is in the mayor's deposition. I don't have the page, even though I did write it down earlier. It is in the mayor's deposition and it is like what Mr. Chang said with respect to it was a two week period starting on the date of Mr. Milton's suspension. Starting that day, but how much of it was that day? I guess what I'm asking is trying to discover how much of the communication from the public had to do with the suspension. If the suspension took place prior to the communications from the public, then the concern for disruption or the actual disruption, as you describe it, would not have, wouldn't be on the basis of statements from the public. It is in the mayor's deposition and the way that the mayor did describe it was two weeks, a two week period starting the week of the suspension. So I can't clarify for you. The suspension lasted what, one day? Yes. So there's 13 other days where these calls could have come in? Based on the mayor's testimony and his deposition, but there was also the complaints from the other two prior fire department employees who had seen the image and were offended by it. And you both believe that it had racist implications. But those people weren't then working in the fire department, so they weren't disrupting anything inside the department. And the other calls were from the public, who was unaware of the incident. So it seems, I'm trying to figure out how that's played into the suspension decision. If there were two, even if it was former employees who had seen the image and expressed concern about it and expressed that they had perceived the image as having racist implications, if the mayor has put on notice that that's the way the public is going to receive this image, then that alone would create a reasonable concern or a reasonable anticipation that it's going to create problems within the department. He did testify that there were black firefighters in the fire department and the police department. And the district court below noted the racial tensions that are present in the city of Forest City. Look, I have no problems if there's actual evidence of disruption, like if people start complaining, if there's fights, if there's verbal sparring contests between employees. But I guess what I really worry about here is all we seem to have is a heckler's veto, which is you have a lot of people outside of the department complaining about something. And rather than dealing with it, it seems like the mayor just fired the employee. And so that concerns me. That's why I think pickering analysis requires an actual disruption. And I'm not sure that I see one in the record. Well, under Enzaldua, only a reasonable belief that disruption will occur is required. Well, if we look at that reasonable belief that there might be a disruption, if you look at Judge Holmes's decision, Judge Holmes talks about there being people who requested that Melton not be sent to their homes, right? And whatever that is, that might be evidence of some potential disruption, right? And so my question is, where did the judge gather that information from? Is that in the mayor's testimony? Is there an affidavit someplace? Is there other evidence in the record from which Judge Holmes might have made that conclusion? Because I think that the specific sentence that I'm referring to is on page 7. And he said that 20 to 25 Forest City residents contacted Mayor Williams asking that Melton not be sent to their homes in the event of a medical emergency or fire. That seems like a large number. And that seems like a pretty specific request, you know, rather than merely people just calling and saying, hey, you know, I'm offended. And so my question is, is there a factual basis for that conclusion and for that what appears to be an apparent fact finding by Judge Holmes? The basis would have come from Mayor Williams' deposition testimony. Did you know if he specifically said that? I mean, I was a trial judge for a long time, and occasionally there's some imprecision that creeps into our findings of fact. And I'm just really asking, do you know the record? And in fact, does the record, are there really calls from like 20 to 25 people that said, don't send that dude to my house? Because that would sound like it's got some potential for disruption. No, there were 20 to 25 calls. That came straight from the mayor's testimony. There were 20 to 25 calls complaining, but were there really people who said, don't send him to me? That was what the mayor testified. That what he testified to? Yes. Thank you. Thank you. So, assuming that the mayor did articulate a reasonable belief that disruption would occur, the district court properly determined that the city's interest in promoting the efficiency of the public services it performs outweighed Milton's interest in commenting on the matter of public concern. And when the district court applied the Pickering factors, the balance weighed in the city's favor. The factors, of course, are the need for harmony in the workplace, which our discussion earlier touched on. If this message was being received as one implicating racism, that obviously is going to affect harmony in the workplace in a fire department, such as the fire department at the city of Forest City. So, I'm hearing you argue the same thing you were arguing before. Do we just presume that anything that's perceived by others as racist automatically creates disruption? I mean, you seem to want us to make a presumption here, and maybe what Judge Erickson is getting at is enough, but you say if it's perceived as racist, it automatically creates a presumption. That's what I heard you just say. Well, I think that Mayor Williams would be reasonable in believing that having a firefighter on staff who's communicating those types of messages that are being received that way by the public would create a disruption within the department. So, does it actually have to be racist, or can it just be perceived as racist? Well, I think that the fact that it's being perceived as racist is really what matters. But if that's the case, doesn't the First Amendment exist to protect unpopular speech? And if it's true for racism, isn't it true for same-gender attraction? Don't we end up in the same place? And if you look at something where, say, 30% of the American population might belong to a religious organization that holds that same-sex relationships are immoral, are we really saying that if you say that and somehow fence some group of people that you could be terminated and that there's no consequence for that for the city? Well, I think you would have to go back. I mean, that's a big hypothetical. Well, I know it's a big hypothetical, but it strikes me that there's a slippery slope here. If you just say that all offensive speech, that it's perceived to violate some sort of fundamental principle, that it's actionable, I mean, it just starts looking like it undermines the First Amendment. Well, what I can say is based on the record here that if Mayor Williams received complaints and information that this message was being received as a racist one, he would have a reasonable belief that a disruption within his department would occur based on the way the message was being received. I do want to touch briefly on qualified immunity. The appellant has not cited any case factually on point that would specifically make clear to Mayor Williams that his terminating Mr. Milton under these circumstances was a violation of the First Amendment. Mr. Chang mentioned the Washington case. Are you familiar with that case he mentioned? Yes, I am. Would you distinguish it or explain why he's incorrect or dispute his view? Yes. The Washington case is not applicable here. What was at issue in the Washington case was members of the sheriff's office supporting another member of the sheriff's office's intention to run for sheriff against the current sheriff. They were transferred because of their indication that they would support the sheriff's opponent. That was done admittedly and they were arguing that It's factually not analogous. They were arguing just simply because of their loyalty and if they were going to openly support another candidate, it's factually not applicable here. I would just like to point out that this court in Sexton, which is another case cited by the appellant, did make the statement that the asserted First Amendment right can rarely be considered clearly established for purposes of the Harlow Qualified Immunity Standard. I wonder about that, though. So again, we got to look at the record on disruption, but if there's been absolutely no disruption, assume we've reached that conclusion, actual disruption or even a reasonable belief of actual disruption. Do we have to grant qualified immunity or couldn't we deny it as clearly established that if there's no disruption, you can't you can't terminate somebody for their First Amendment speech? Well, or if the mayor did not have a reasonable belief to anticipate, there would be a disruption. Well, I know, but I'm asking you to suppose if we if the hypothetical if he did not have a reasonable belief. Well, this statement is speaking to the pickering factors. And that was the point that I was going to make. There's no case clearly establishing under the facts that Mayor Williams was faced with under this case. This is clearly a First Amendment violation. And he's entitled to qualified immunity. I was just going to say your time's expired. We appreciate the argument you made. And we'll give a brief time for our rebuttal and we'll continue with the case. Did you have something that you were just about to close with in conclusion? No, other than the city is entitled to an affirmance of the holdings below as well. Thank you, Your Honors. Thank you, Miss Monahan. Mr. Chang, your rebuttal. I know your time's expired, but we'll give you a couple minutes to respond to what you've heard. Thank you, Your Honor. Four points in rebuttal. My friend's presentation is precisely the reason why this court does not defer to the government's interpretation of speech in pickering analysis. There's great risk that under the guise of doing the pickering analysis that the government would suppress speech based on content. The government, in theory, could deem everything racist, find some vague assertions and complaints, and fire the employees. If that's the case, then no government employee has a First Amendment right while they're working for the government. The weakness of your case, counsel, though, is the actual evidence that Judge Erickson pinned down, which is the, I don't know if you have a different view of the record, but the 20 to 25 calls. And if they said, we do not want Mr. Melton coming to our home in the case of a fire or another emergency. Sure, Your Honor. I have a couple of responses to that. The first is, this is really key, that the calls came after the post-firing news coverage aired, to which my client could not respond. So it's after the firing, you said? It was after he had already been fired? Okay. That's correct, Your Honor. And also, what Pickering also asked is whether the speech itself caused the disruptions, not whether the government's response caused further disruptions. We know from the record that the mayor was communicating with the news outlet about the story. So my client is not responsible for any disruptions that was caused by the government itself. My client took down the post as soon as he learned that there was misunderstanding about the post. And also, it's not even clear whether or not the 20 to 25 calls could actually qualify as evidence for a prediction of disruption, because the government put forth no evidence that the fire department makes manning decisions when it responds to calls based on those complaints, or that it even honors those requests from the people. And also, the government put forth no evidence that if somebody's house was burning down and Mr. Melton showed up, those people would have turned down his services. And we know from the record that Mr. Melton wants to serve everybody. Just two more points briefly, Your Honor. We turn to balancing. Even if you disagree with me about the sufficiency of the evidence to trigger Pickering balancing, we get to the balancing. And here, context is key. This was all based on a misunderstanding of what Mr. Melton meant. He meant to speak on abortion. There were minor occurrences of misunderstanding. He was apologetic. He took it down as soon as there was misunderstanding. And the city's evidence is weak. The proportionality principle still applies when you're doing the balancing. And finally, if this court has any hesitancy about granting my clients an outright win on appeal, what this court can do is vacate and remand for further factual findings. This court has said that factual predicates going to the reasonableness of prediction can be and should be found by the jury. So if this court has any doubt, it can always vacate and remand. And finally, on the qualified immunity, this court has said you don't need an exact match. We have given you Washington. There's also Sexton and also Belk. For these reasons, this course reverse. Thank you very much. Thank you, Mr. Chang. Thank you also, Ms. Moynihan. The court appreciates both counsel's participation in argument before the court today. We'll continue to study the briefing in the case and conference and render decision in due course. Thank you. Thank you. I believe that concludes our special session for this afternoon. The court will be in recess until further call. Gentlemen, I'll send you a note for a video call here. Let's see. It's about a quarter to three. Ten minutes should give us all give us.